**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

WALLACE WORMACK, *et al*.,

      Plaintiff,

v.

CBAC GAMING, LLC, *et al*.,

      Defendants.

Case No. 1:22-cv-01108-SAG

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**INTRODUCTION**……………………………………………………………………….1

**STATEMENT OF MATERIAL FACTS THAT CREATE GENUINE ISSUES**……………4

**STANDARD OF REVIEW**……………………………………………………….....…..13

**ARGUMENT**………………………………………………………………………….14

    I.    **THE CASINO OWED A DUTY TO PROTECT THE PLAINTIFFS FROM THE ASSAILANTS BASED UPON KNOWLEDGE OF PRIOR VIOLENT CRIMINAL ACTIVITY IN THE GARAGE AND AT THE CASINO**……..14

    II.    **DERK BOSS, PLAINTIFFS' LIABILITY EXPERT, CLEARLY ESTABLISHES THROUGH HIS REPORT AND DEPOSITION TESTIMONY THAT THE CASINO FAILED TO EXERCISE REASONABLE CARE IN ITS GARAGE SECURITY PRACTICES AT THE TIME OF THE ATTACK ON THE PLAINTIFFS**……………………16

        a.  **Mr. Boss has Offered Opinions that the Casino Failed to Exercise Reasonable Care by Failing to Establish Sufficient Security Measures to Deter the Assault on the Plaintiffs**…………………………………………16

        b.  **Mr. Boss Opined that Tweedle's Failure to Respond to and Investigate the Verbal Altercation Between the Assailants and the Plaintiffs Fell Below the Standard of Care**…………………………………………..…19

    c.   **The Casino's Failure to Have Three Patrol Vehicles Roving in the Garage at the Time of the Incident Was also a Violation of the Standard of Care……………………………………………………………………20**

    d.   **Mr. Boss Applied the Correct Standard for the Liability of a Casino for Injuries to its Invitees……………………………………………....21**

    e.   **There is Legally Sufficient Evidence that the Casino had Actual or Constructive Knowledge of a Dangerous Condition……………….……22**

III.    **THERE ARE GENUINE DISPUTES OF MATERIAL FACT AS TO WHETHER THE CASINO'S NEGLIGENCE WAS A PROXIMATE CAUSE OF PLAINTIFF'S INJURIES……………………………..…....23**

    a.   **Mr. Boss Sufficiently Opined as to a Causal Link Between the Casino's Breach of the Standard of Care and Plaintiffs' Injuries…………..……..23**

    b.   **There is Sufficient Evidence to Create a Triable Issue of Fact as to Whether the Assailants' Conduct was Foreseeable……………..…..…25**

IV.    **DEFENSE COUNSEL'S CRITICISMS OF MR. BOSS' QUALIFICATIONS ARE MERITLESS…………………………………………………....27**

**CONCLUSION……………………………………………………………...…29**

## INDEX OF EXHIBITS

| EX. # | DESCRIPTION |
|---|---|
| 1 | Excerpts from Deposition Transcript of Derk Boss |
| 2 | Excerpts from Deposition Transcript of Thomas Cassella |
| 3 | Boss Report Exhibit 1-I |
| 4(a)-4(e) | Baltimore Police Department Police Reports (bates stamped by BPD, with certification from BPD) |
| 5 | Baltimore Police Department Calls for Service Report (bates stamped by BPD, with certification from BPD) |
| 6 | Excerpts from Deposition Transcript of Charles McCreedy |
| 7 | Excerpts from Deposition Transcript of Sheldon Tweedle |
| 8 | Excerpts from Deposition Transcript of Antonio Queen |
| 9 | Excerpts from Deposition Transcript of Charles Stephen Franklin |
| 10 | Excerpts from Deposition Transcript of Wallace Wormack |
| 11 | Excerpts from Deposition Transcript of Willie Craft |
| 12 | Excerpts from Deposition Transcript of Alan Zajic |
| 13 | Boss CV |

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **WALLACE WORMACK,** *et al.,* | |
| **Plaintiff,** | |
| **v.** | |
| | **Case No. 1:22-cv-01108-SAG** |
| **CBAC GAMING, LLC,** *et al.,* | |
| **Defendants.** | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiffs, Wallace Wormack, Lakeisha Jones, and Carolyn Marshall, jointly, by and through their undersigned counsel, and respectfully file this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, and in support thereof state as follows:

## INTRODUCTION

This case is about a casino's failure to properly utilize and position its security guards so that they could effectively deter and prevent violent attacks upon the casino's patrons within its crime-ridden parking garage. In the early morning hours of March 3, 2019, Wallace Wormack, his wife Lakiesha Jones, and his mother-in-law Carolyn Marshall (hereinafter referred to as "the Plaintiffs") were followed, threatened, and viciously attacked by two men on the fifth floor of the Horseshoe Casino parking garage (hereinafter referred to as "the garage") in Baltimore, Maryland, rendering Mr. Wormack permanently disabled. During the entirety of the Plaintiffs' encounter with the assailants, there was not a single security guard present on the fifth floor of the garage to deter the attack. In the five years prior to the attack, thirty-three violent crimes had

occurred inside of the garage, including a shooting and other aggravated assaults, armed and unarmed robberies, and a rape.

In the Motion for Summary Judgment (hereinafter referred to as "the Motion"), Defendant Caesars Baltimore Management Company, LLC (hereinafter referred to as "CBMC"), the operator of the Horseshoe Casino, emphasizes the amount of security at the casino and the length of time it took for security to arrive after the physical attack had started, but largely ignores the Plaintiffs' key allegation, which is that the Horseshoe Casino did not have a security guard in the proper location on the fifth floor of the garage to deter the physical attack in the first place. As Derk Boss, Plaintiff's expert, has opined, the closest security guard to the fifth floor of the Horseshoe garage was still positioned too far from the casino patrons and the assailants to have served as an effective deterrent against the attack. Boss Dep. (July 21, 2023) 291:14-25 (excerpts attached as Ex.1). The issue of whether there were sufficient deterrents in place at the time of the incident and whether the lack of sufficient deterrents was a proximate cause of Plaintiffs' injuries is a question of fact for the fact-finder to determine.

The casino garage's poor track record of hosting violent crimes gave rise to a duty on the part of the Casino to provide reasonable security within the garage to protect its patrons. The Maryland Court of Special Appeals has held that there are three general scenarios on which a landowner may owe a duty to someone injured by third-party criminal activity on a premises:

    (1) prior knowledge of similar criminal activity – evidenced by past events – occurring on the premises;
    (2) prior knowledge of the violent tendencies of that particular assailant; and
    (3) knowledge of events occurring immediately before the actual criminal activity that made imminent harm foreseeable.

*Troxel v. Iguana Cantina, LLC*, 201 Md. App. 476, 497 (2011).

In its Motion, the defense completely ignores the first scenario in arguing that it owed no duty. In this case, there is abundant evidence of past violent criminal activity similar to the physical assault crimes that were perpetrated upon the Plaintiffs in the garage, thereby rendering the attack on the Plaintiffs reasonably foreseeable and creating a duty on the part of the Casino to employ reasonable security measures for the protection of its patrons, including the Plaintiffs.

There is also ample evidence that the Casino's duty towards the Plaintiffs was breached in this case. Derk Boss, Plaintiffs' expert in casino security operations, identified numerous breaches of the standard of care on the part of the Casino, including his main contention that the Casino's failure to post a stationary guard in a location obvious to customers on the fifth floor of the garage, and near the stairwell in particular in order to identify and deter criminal activity. Mr. Boss' opinions on the standard of care for the Horseshoe Casino's garage security practices are based upon the extensive prior history of violent crime within the garage, and he utilized the same forensic methodology that was applied by the Casino's own experts in this case. *See* Zajic report (Def. MSJ Ex. 6) at 3-4.

Moreover, there is clear evidence supporting that the attack on the Plaintiffs was foreseeable and had the Casino complied with the standard of care, the attack on Plaintiffs would not have occurred.

The Motion is largely devoted to impeaching Mr. Boss' credibility in the hope that the Court will dispense of his standard of care opinions. The defense, however, repeatedly mischaracterizes Mr. Boss' opinions and methodology by selectively highlighting responses from Mr. Boss' seven-hour deposition without providing the proper context for his answers. Notwithstanding the defense's repeated mischaracterizations of Mr. Boss' opinions and methodology in the Motion, the defense also fails to mention that Mr. Boss has co-authored two

books on casino security with the defense's own expert in this case, Alan Zajic, and that even

Mr. Zajic concedes that Mr. Boss is an expert qualified to give opinions on casino security

measures.

Accordingly, Plaintiffs ask for the Court to deny summary judgment in this case.

## STATEMENT OF MATERIAL FACTS WHICH RAISE GENUINE ISSUES THAT PRECLUDE SUMMARY JUDGMENT AGAINST PLAINTIFFS

1. At all relevant times, Defendant Caesars Baltimore Management Company, LLC (hereinafter "Defendant") was the operating entity of the Baltimore Horseshoe Casino. Cassella Dep. 9:21-10:1 (February 16, 2023) (excerpts attached as Ex. 2).

2. At all relevant times, The Baltimore Horseshoe Casino had a seven-floor parking garage (hereinafter referred to as "the garage") with thirty-five hundred parking spaces. *See* Boss report (Def. MSJ Ex. 4) at 4.[1]

3. From March 3, 2014 to March 3, 2019, thirty-three violent crimes had been reported to have occurred within the garage. *Id*. at 22; *see also* Boss Report exhibit I (Boss Dep. exhibit 1-I), Ex. 3.[2]

4. From March 3, 2014 to March 3, 2019, there were one hundred and ninety-five violent crimes involving assaults, robberies, attempted robberies, and one rape that were documented by the BPD to have occurred on the premises of the Horseshoe Casino, including in its parking garage. *See* Baltimore Police Department Reports

---

[1] Plaintiffs will refer to Mr. Boss' report throughout this opposition but have not attached it as an exhibit to this opposition.  Mr. Boss' report was filed under seal and attached as Exhibit 4 to Defendant's Motion for Summary Judgment.

[2] The thirty-three police reports contained in Exhibit 3 were subsequently obtained from the Baltimore Police Department (hereinafter referred to as "BPD") with a Certificate of Records of Regularly Conducted Activity in response to a subpoena. They are attached as part of Exs. 4(a)-4(e) to this Opposition and have the following Bates stamp numbers placed by the BPD: 40-51; 64-66; 69-70; 85-88; 100; 117-122; 188-191; 199-201; 223-225; 234-241; 255-257; 261-265; 272-273; 292-300; 307; 342-343; 366-368; 372-377; 399; 449; 450-454; 474-476; 530-533; 594; 599; 628-629; 630; 658-659; 672-676; 686-689; 730-734.

(with Certificate of Records of Regularly Conducted Business Activity) (Exs. 4(a)-4(e)).[3]

5. From March 3, 2014 to March 3, 2019, the Baltimore Police Department ("BPD") received five hundred and nine calls for common assaults at the Horseshoe Casino. *See* BPD Calls for Service Report (with Certificate of Records of Regularly Conducted Business Activity) (Ex. 5).[4]

6. From March 3, 2014 to March 3, 2019, the BPD received fifty-two calls for aggravated assaults involving hands at the Horseshoe Casino. *Id.*

7. From March 3, 2014 to March 3, 2019, the BPD received four calls for aggravated assaults involving guns at the Horseshoe Casino. *Id.*

8. From March 3, 2014 to March 3, 2019, the BPD received twenty-eight calls for robbery at the Horseshoe Casino. *Id.*

9. The Horseshoe Casino did not have a surveillance agent dedicated to monitoring the surveillance cameras within the garage. *See* Boss Report (Def. MSJ Ex. 4) at 32.

10. The Horseshoe Casino surveillance department did not monitor the incident between the assailants and the Plaintiffs in real time. McCreedy Dep. 38:5-39:7 (May 2, 2023) (excerpts attached as Ex. 6).

11. In 2017, the Horseshoe Casino created a garage security team to patrol the garage. Tweedle Dep. 33:12-34:7 (May 2, 2023) (excerpts attached as Ex. 7).

---

[3] These police reports that contain a Certificate of Records of Regularly Conducted Business Activity were produced to Plaintiffs' counsel by the BPD in response to a subpoena. The police reports were also included in an exhibit to CBMC's Corporate Designee Thomas Casella's deposition, where they were identified in his deposition as Ex. 10.

[4] The Calls for Service Report was also Exhibit 9 to the deposition of CBMC Corporate Designee Thomas Cassella. Plaintiffs subsequently obtained the same report from the BPD along with a Certificate of Records of Regularly Conducted Business Activity in response to a subpoena.

12. The Defendant's highest priority with respect to the garage security team was making the security team visible to patrons in the garage. Cassella Dep. 69:11-70:5 (Ex. 2)

13. The Defendant agrees that visible security personnel help prevent altercations. *Id.* at 123:7-13 (Ex. 2).

14. The Defendant agrees deterrence is very important to a casino. *Id.* at 122:18-21 (Ex. 2).

15. The garage team did not have any written guidelines, policies, or procedures. *Id.* at 60:9-16 (Ex. 2).

16. The garage team had six members. Tweedle Dep. 35:5-11 (Ex. 7).

17. The manager of the garage security team was Sheldon Tweedle. *Id.* at 33:17-21 (Ex. 7).

18. The Casino had trained Tweedle in verbal de-escalation and hands-on self-defense. *Id.* at 23:4-7 (Ex. 7).

19. If Tweedle saw two people arguing, he was supposed to introduce himself, let them know that he was casino security, then try to separate the parties, speak to one party, get both sides of the story, and see if a resolution can be reached. *Id.* at 23:21-24:12 (Ex. 7).

20. If there was a physical altercation, Tweedle and the security guards had a right to go hands-on and use force. *Id.* at 24:13-18 (Ex. 7).

21. According to Casino, there should have been two golf carts roving the garage at the time of the incident. Cassella Dep. 55:10-17 (Ex. 2).

22. According to Sheldon Tweedle, there was only one golf cart in use that evening. Tweedle Dep. 59:22-60:2 (Ex. 7).

23. The surveillance video does not show the two golf carts roving at the time of the incident. Casella Dep. 55:4-17 (Ex. 2).

24. The Casino's standard was to have two golf carts and one vehicle roving the garage and then one guard stationary on the third floor. *Id*. at 53:5-21 (Ex. 2).

25. At time of the incident, the fourth, fifth and sixth floors of the garage were open to Casino customers for general parking. *Id*. at 82:13-83:1 (Ex. 2).

26. Mr. Tweedle would assign garage security team members to stand outside of the garage levels. Tweedle Dep. 90: 9-14 (Ex. 7).

27. There were only five total garage team members working on the night of the incident, including Tweedle. *Id*. at 52:4-17 (Ex. 7).

28. Tweedle does not know where two of the garage team members were at the time of the incident. *Id.* at 83:8-10; 83:19-84:2 (Ex. 7).

29. Garage security team member McDowell was in a stationary post outside of garage level two at the time of the incident. *Id*. at 79:19-21 (Ex. 7).

30. Garage security team member Newsome was on level four at the time of the incident. *Id*. at 81:16-82:2 (Ex. 7).

31. There were no garage team members on the fifth floor of the garage at the time of the incident. *Id*. at 84:3-12 (Ex. 7).

32. Sheldon Tweedle was the closest garage team member to the location of the incident. *Id*.

33. Tweedle was parked in a security vehicle on a ramp between the fifth and sixth levels of the parking garage at the time of the incident. *Id.* at 70:18-71:5 (Ex. 7).

34. Tweedle was stationary and not patrolling at the time of the incident. *Id.* at 71:8-12 (Ex. 7).

35. There was a large structure in the middle of the fifth floor of the garage with dimensions of thirteen by fifteen feet. *See* Boss report (Def. MSJ Ex. 4) at 24.

36. Plaintiffs' expert, Derk Boss, conducted a site inspection of the casino garage fifth floor, parked where Mr. Tweedle was stationed at the time of the incident, and determined that Mr. Tweedle's view of the fifth floor of the garage was obstructed. Boss Dep. 97:21-98:19 (Ex. 1).

37. The Baltimore Police Department had a substation located within the garage so that its officers assigned to the casino mini district could have somewhere to report to. Queen, BPD Designated Representative Dep. 17:19-18:6 (October 5. 2023) (excerpts attached as Ex. 8).

38. The BPD's patrolling of the casino mini district extended beyond the Horseshoe Casino's property. *Id.* at 25:21-26:2 (Ex. 8).

39. The casino mini district encompassed areas north of the Horseshoe Casino property up to Ostend Street, west to Wicomico Street, south to Bush Street and then east to the water. *Id.*

40. The BPD would not patrol in the garage unless it was notified that police action was needed, such as a call for service. *Id.* at 29:13-30:10 (Ex. 8).

41. At the time of the incident, Masada Tactical was inside the Horseshoe casino. Franklin Dep. 57:19-22 (June 12, 2023) (excerpts attached as Ex. 9).

42. At the time of the incident, the Special Police Officers ("SPO's") were inside the casino. Cassella Dep. 35:16-36:8 (Ex. 2).

43. On the evening of March 2, 2019, Plaintiffs arrived at the Horseshoe Casino a little before 11 p.m. Wormack Dep. 104:20-105:1 (March 7, 2023) (excerpts attached as Ex. 10).

44. Plaintiff Wallace Wormack went to the Horseshoe Casino that night to purchase pizza. *Id*. at 116:3-8 (Ex. 10).

45. Ms. Jones and Ms. Marshall gambled that evening in the Horseshoe Casino. *Id*. at 117:6-7 (Ex. 10).

46. Plaintiffs decided to leave the casino and enter the garage to retrieve their vehicle between 2:20 a.m. and 2:30 a.m. on March 3, 2019. *Id*. at 130:1-9; 132: 9-15 (Ex. 10).

47. Plaintiffs exited a stairwell and entered the fifth level of the parking garage. *Id*. at 139:19-22; 140:1 (Ex. 10).

48. Plaintiff Wallace Wormack never saw security in the garage before encountering the assailants. *Id*. at 140:2-6 (Ex. 10).

49. Plaintiff Wallace Wormack did not see any security on the fifth floor of the garage as he exited the stairwell. *Id*. at 140:10-15 (Ex. 10).

50. Ms. Jones and Ms. Marshall did not see any security on the fifth floor of the garage prior to the incident either. *Id*. at 141:9-14 (Ex. 10).

51. While walking towards the direction of their vehicle in an aisle on the fifth floor, Plaintiffs encountered a darkish gray vehicle that was driving past them. *Id*. at 143:4-13; 144:14-15 (Ex. 10).

52. The female occupant of the vehicle then asked Plaintiff Wallace Wormack whether he had a lighter. *Id*. at 145:9-12 (Ex. 10).

53. Plaintiff Wallace Wormack responded "no" and that he did not smoke. *Id.* at 143:4-13 (Ex. 10).

54. As the car moved past Plaintiffs, the female occupant of the vehicle yelled and called Plaintiff Wallace Wormack a "faggot-assed bitch." *Id.* at 145:18-22; 146:1-7 (Ex. 10).

55. The interaction between Wormack and the female occupant of the vehicle occurred at approximately 2:31:21 a.m. *See* Boss Report (Def. MSJ Ex. 4) at 10; *see also* Surveillance video (Def. MSJ Ex. 1).

56. The vehicle continued down the aisle and parked in a travel lane near the elevator entrance to the casino on garage level five. Cassella Dep. 104:4-15 (Ex. 2).

57. At approximately 2:31:38 a.m., the vehicle parked in a "no parking" zone. *See* Boss Report (Def. MSJ Ex. 4) at 10; *see also* Cassella Dep. 104:13-15 (Ex. 2) and Surveillance video (Def. MSJ Ex. 1).

58. The casino did not permit vehicles in the garage to stop in the location where the vehicle stopped. Cassella Dep. 104:13-15 (Ex. 2)

59. There was no security guard stationed at or near the elevator entrance and stairwell of garage level five. Tweedle Dep. 84:3-12; 85:15-21 (Ex. 7).

60. The occupants of the vehicle were Ms. Sequoia Brooks, Mr. Kilil Goodman, and Mr. Jordan Waters. Cassella Dep. 104:10-17 (Ex. 2).

61. At approximately 2:31:47 a.m., Mr. Goodman and Ms. Brooks exited the vehicle and began to follow the Plaintiffs. *See* Boss Report (Def. MSJ Ex. 4) at 11; *see also* Surveillance video (Def. MSJ Ex. 1).

62. The Plaintiffs then saw Mr. Goodman and Ms. Brooks appear. Wormack Dep. 155:1-2 (Ex. 10).

63. As Mr. Goodman and Ms. Brooks began to follow the Plaintiffs, Mr. Goodman was clapping and yelling at the Plaintiffs, "that the faggot motherfucker right there, yeah" and "yeah, I'll fuck you up." *Id*. at 155:3-10 (Ex. 10).

64. Ms. Brooks was yelling similar phrases like, "Yeah, fuck you all." *Id*.

65. At approximately 2:32:01 a.m., Mr. Goodman and Ms. Brooks continued to walk towards Plaintiffs and Mr. Goodman continued to clap. *See* Boss Report (Def. MSJ Ex. 4) at 12; *see also* Surveillance video (Def. MSJ Ex. 1).

66. Mr. Wormack told Mr. Goodman, "Bro, I don't want any trouble man. Just go about your business." Wormack Dep. 157:6-12 (Ex. 10).

67. Ms. Jones told Mr. Goodman, "Look man, just go on, like go on" while Mr. Goodman continued to cuss. *Id*. at 157:4-15 (Ex. 10).

68. Mr. Tweedle could not see the verbal altercation between the Plaintiffs and Goodman and Brooks from where he was stationed in the garage. Tweedle Dep. 74:21-75:1 (Ex. 7).

69. At approximately 2:32:55 a.m., Mr. Goodman attacked the Plaintiffs. *See* Boss Report (Def. MSJ Ex. 4) at 15; *see also* Surveillance video (Def. MSJ Ex. 1).

70. Mr. Goodman pushed Ms. Jones. Wormack Dep. 157:4-15 (Ex. 10).

71. Plaintiffs did not have the opportunity to leave and seek assistance. *Id*. at 157:22-158:12 (Ex. 10).

72. Mr. Wormack was attempting to de-escalate the situation. *Id*.

73. At approximately 2:33 a.m., Mr. Goodman struck Ms. Marshall, Ms. Jones, and Mr. Wormack several times with his closed fists to their face and body. Craft Dep. 70:16-71:21 (May 31, 2023) (excerpts attached as Ex. 11).

74. At approximately 2:33:16, Jordan Waters ran over from the direction of the parked Honda Accord and began punching Mr. Wormack with closed fists several times. *Id.*

75. Mr. Waters then vigorously punched Mr. Wormack several times more before grabbing Mr. Wormack and body-slamming him onto his back area, at which time Mr. Wormack hit the back of his head on the hard concrete garage ground floor and lost consciousness. *Id.*

76. Mr. Tweedle was looking down in his security vehicle before he heard cursing and yelling and looked up to see a physical altercation between the Plaintiffs and the assailants. Tweedle Dep. 76:17-21 (Ex. 7).

77. At approximately 2:33:40 a.m., Mr. Tweedle arrived in his security vehicle near the scene. *See* Boss Report (Def. MSJ Ex. 4) at 19; *see also* Surveillance video (Def. MSJ Ex. 1).

78. At approximately 2:33:46 a.m., the attack on Plaintiffs by the assailants ended. *See* Boss Report (Def. MSJ Ex. 4) at 20; *see also* Surveillance video (Def. MSJ Ex. 1).

79. Mr. Tweedle was the first security officer to respond to the scene. Casella Dep. 24:19-22 (Ex. 2).

80. After Mr. Tweedle reported the assault over the radio, he was joined by Officer Newsome, other security officers from inside the casino, and BPD. *See* Boss Report (Def. MSJ Ex. 4) at 5.

81. Defendant's corporate designee, Thomas Cassella, did not see any BPD officers patrolling when he viewed the surveillance video of the incident. Casella Dep. 47:13-48:9 (Ex. 2).

82. Other than Officers Tweedle and Newsome, Mr. Cassella did not see any other persons that could have been patrolling the garage at the time of the incident on the surveillance footage he viewed. *Id*.

83. Mr. Goodman and Mr. Waters were charged with crimes pertaining to the incident. Craft Dep. 51:2-11 (Ex. 11).

## <u>STANDARD OF REVIEW</u>

A party is not entitled to summary judgment unless there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See* Fed.R.Civ.Pro. 56(c). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As the Court is well aware, "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. Furthermore, "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Id*. The non-moving party need not produce evidence in a form that will be admissible at trial in order to avoid summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The Supreme Court in *Anderson* also noted "Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255.

## ARGUMENT

**I.    THE CASINO OWED A DUTY TO PROTECT THE PLAINTIFFS FROM THE ASSAILANTS BASED UPON KNOWLEDGE OF PRIOR VIOLENT CRIMINAL ACTIVITY IN THE GARAGE AND AT THE CASINO**

Pursuant to Maryland law, a landowner has a duty to protect invitees from third party criminal conduct on their property if it is shown that the landowner had "knowledge of events, or past experience that indicates a likelihood of conduct by third persons in general, or conduct by a particular individual who is likely to harm an invitee."  *Corinaldi v. Columbia Courtyard, Inc.*, 162 Md. App. 207, 221 (2005). The court in *Corinaldi* identified three factual scenarios when an injured party seeks to hold a possessor of land liable for injuries from a third party. *Id*. at 223-24. *See also Troxel*, 201 Md. App. at 497 (discussing the "three general theories on which a landowner may be held liable when someone is injured by third party criminal activities on the premises") and *Hansberger v. Smith*, 229 Md. App. 1, 21-22 (2016) (discussing the three theories of premises liability).

In the first scenario, an assailant enters a premises without invitation and without knowledge of the defendant. *Corinaldi*, 162 Md. App. at 223. In that scenario, the duty is based on "knowledge of prior similar incidents, not on knowledge of facts relating to the incident in question." *Id.* Thus, a plaintiff may establish a duty by providing evidence of prior similar violent crimes occurring on the premises to prove that the defendant should have eliminated conditions that contributed to that prior criminal activity (by providing security, lighting, locks, etc.). This is the scenario at issue in the *Scott v. Watson*, 278 Md. 160 (1976). In *Scott,* a landlord received complaints about criminal activity in the parking garage of an apartment building but failed to take action to secure the premises. The Court of Appeals held that the landlord could be liable, holding that "[i]f the landlord knows, or should know, of criminal activity against persons

14

or property in common areas, he then has a duty to take reasonable measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity." *Id.* at 169.

In the instant case, Plaintiffs had the status of invitees at the Horseshoe Casino, as they were customers. Additionally, there is abundant evidence of similar prior crimes having occurred in the garage to have created a duty on the part of the Casino. Police reports obtained from the Baltimore City Police Department revealed that in the five years prior to the date of the attack on the Plaintiffs, there were thirty-three reported incidents of violent crime within the garage, including twenty-two assaults, four aggravated assaults (including a shooting), one attempted armed robbery, one armed robbery, one robbery and one rape. *See* Boss Report (Def. MSJ Ex. 4) at 22; *see also* Boss Report exhibit I (Boss Dep. exhibit 1-I), Ex. 3.

Moreover, the Baltimore City Police Department's Calls for Service Report reflects that in the five years prior to the attack on the Plaintiffs, there were five hundred and nine calls to the BPD for common assaults at the Horseshoe Casino and fifty-two calls for aggravated assaults. *See* BPD Calls for Service Report (with Certificate of Records of Regularly Conducted Business Activity) (Ex. 5).

Plaintiffs' counsel also obtained police reports from the BPD for this five-year period for the entire casino property, which reflect one-hundred and ninety-five police reports for violent crimes involving assaults, robberies, attempted robberies, and a rape. *See* Baltimore Police Department Reports (with Certificate of Records of Regularly Conducted Business Activity) (Exs.4(a)-4(e)).

Accordingly, there is overwhelming evidence present of prior similar criminal activities at the garage to have imposed a duty upon the casino to take reasonable security measures to protect the Plaintiffs from third party criminal activity.

## II. DERK BOSS, PLAINTIFFS' LIABILITY EXPERT, CLEARLY ESTABLISHES THROUGH HIS REPORT AND DEPOSITION TESTIMONY THAT THE CASINO FAILED TO EXERCISE REASONABLE CARE IN ITS GARAGE SECURITY PRACTICES AT THE TIME OF THE ATTACK ON THE PLAINTIFFS

### a. Mr. Boss has Offered Opinions that the Casino Failed to Exercise Reasonable Care by Failing to Establish Sufficient Security Measures to Deter the Assault on the Plaintiffs

Mr. Boss has identified numerous ways in which the Casino failed to exercise reasonable care in its security practices at the time of the assault on the Plaintiffs:

> Based upon my experience and training in the field of casino security, a casino exercising reasonable care in its security practices under similar circumstances facing the Horseshoe Casino would have taken the following security measures in its garage:
>
> - Established and positioned security posts at key locations that provide maximum visibility of the area, and that provide guests and customers notice of officer presence, which would include positioning guards on a garage level at or near the stairwells and elevators where there is significant pedestrian traffic.
> - Paid attention and stayed alert to both present and emergent security threats; and
> - Patrolled all active and/or areas of concern on a garage level to ensure there are not any existing or developing safety or security issues or individuals requiring assistance.

*See* Boss Report (Def. MSJ Ex. 4) at 21-22.

With respect to whether the Casino exercised reasonable care in establishing and positioning its security posts within the garage, Mr. Boss explained his opinion succinctly and clearly in his report:

> There was no security officer inside of level 5 of the garage at the time of the incident.  This security deficiency was a violation of the standard of care and a

16

failure to exercise reasonable care on the part of Defendant in its security operation.

*Id.* at 22.

Mr. Boss then elaborated on what the standard of care required with respect to the posting of security guards within the casino garage and the reason it was required:

> There should have been a security officer posted at the elevator entrance/exit for levels four, five and six. This is the area where patrons gather, pass each other, and enter and exit the casino, and the risk is highest for unruly activity.

*Id*. at 24.

Mr. Boss further notes that Sheldon Tweedle – the idle security guard sitting inside a vehicle on a ramp and outside of the garage level and the one guard closest to garage level five – was not positioned to serve as an effective deterrent to crime occurring within the garage level:

> As the criminal activity was occurring primarily inside the garage and not outside of the levels on the ramps, it is my opinion that Tweedle's positioning outside the garage level on a ramp did not provide reasonable security coverage, violated the standard of care, and showed a lack of reasonable care in the Casino's security practice. Tweedle was positioned too far from where the patrons were to be an effective security deterrent or to assist patrons in a timely manner.

*Id*. at 23.

In his deposition, Mr. Boss further explained that Mr. Tweedle, by sitting idly in a car on a ramp outside of the garage level, was in a "poor position" to serve as an effective deterrent to crime occurring within the actual garage level because he was not in an area in the garage where people coming out of the casino could see him. Boss Dep. 292:1-16 (Ex. 1). Tweedle himself confirmed his poor positioning when, at one point in his deposition, he admitted that he could not see the verbal altercation between Plaintiffs and the assailants from his location. Tweedle Dep. 74:21-75:1 (Ex. 7).

17

Mr. Boss also testified that the location of security guards within the garage depends upon the level of crime. Boss Dep. 92:2-9 (Ex. 1). And after having reviewed documents from the BPD indicating hundreds of crimes against persons, he concluded that "different active security posts and patrols should have been used in the garage." *See* Boss Report (Def. MSJ Ex. 4) at 22.

Mr. Boss' opinion that Mr. Tweedle's idle location on the ramp was a "poor position" was also based upon his site inspection of the garage. During the site inspection on May 18, 2023, Mr. Boss determined Mr. Tweedle's vantage point within the garage at the time of the incident based upon Mr. Tweedle's description during deposition testimony as to his location. Mr. Boss then sat in a vehicle from that approximate location and observed that Tweedle's vantage point of garage level five would have been significantly obstructed at the time of the incident:

> From Tweedle's vantage point, it appears he had an obstructed view of the area of the incident. During my site survey of May 18, 2023, I parked my rental sedan on the ramp approximately where Tweedle says in his deposition he parked his vehicle (about 2 feet up the ramp) and where he noted his vehicle was parked on Figure 34. I noted that the vantage point obtained from the location where Tweedle parked his security vehicle on the ramp did not provide a clear view of the 5th floor, the entrance/exit to the elevators, the tow away zone where the assailants parked, a clear and continuing view of the Plaintiffs walking through the garage, or the assailants running at them. There was also a large structure in the middle of the garage level that would have significantly obstructed his view of the Plaintiff and the assailants as they walked towards aisle C. The structure was approximately 13 feet by 15 feet in measure.

*See* Boss Report (Def. MSJ Ex. 4) at 23-24.

With respect to his opinion that Mr. Tweedle was positioned too far from the patrons, Boss also noted that according to his measurements from the site visit, Mr. Tweedle's position outside of the garage level on a ramp between levels five and six "was approximately 240 feet

from the stairwell and elevator, where patrons were entering and exiting the garage level by foot." *Id.* at 23. This distance is more than three-quarters of the length of a football field.

Mr. Boss concluded that the Casino's "placement of officers and vehicles at the entrances to the levels of the garage only showed people entering where security was and that they had security. It did not deter criminal activity on the garage level." *Id.* at 24.

>    **b.    Mr. Boss Opined that Tweedle's Failure to Respond to and Investigate the Verbal Altercation Between the Assailants and the Plaintiffs Fell Below the Standard of Care**

Mr. Boss notes that the assailants' physical attacking of the Plaintiffs "took place at the very end of a long verbal confrontation between the assailants and the Plaintiffs, one that included the assailants physically confronting and shouting threats and expletives at the Plaintiffs for at least one minute two seconds." *Id.* at 25. In fact, the Casino's own liability expert, Alan Zajic, characterized the verbal confrontation between the parties as "verbal mutual combat." Zajic Dep. 150:25-151:11 (September 27, 2023) (excerpts attached as Ex. 12). According to Boss, the standard of care required a garage security team exercising reasonable care to approach the parties and investigate the matter after hearing these verbal threats:

>    Furthermore, Tweedle's failure to investigate the loud clapping, cursing and verbal threats of the assailants showed a lack of reasonable care. A security guard practicing reasonable care would look to investigate why a patron would be cursing loudly at another patron, especially if the security guard was in ear shot of the cursing. To the extent that the assailants could be heard by Tweedle cursing or yelling at the Plaintiffs, Tweedle should have investigated at that time.

*See* Boss Report (Def. MSJ Ex. 4) at 25.

In another portion of Mr. Tweedle's deposition, he contradicts his previous testimony that he couldn't see the location of the verbal altercation and states that, from his location on the ramp, he could see the entire length of the aisle in which the assailants and Plaintiffs had a prolonged verbal altercation, other than a "five-foot" blind spot created by a storage closet.

Tweedle Dep. 133:16-134:6 (Ex. 7). Mr. Tweedle also claimed that from his location on the ramp, he could also hear what was transpiring on garage level five all the way down to the location of the stairwell where the assailants' vehicle had been abandoned in a no-parking zone. *Id.* at 134:7-11 (Ex. 7). And yet, despite the parties having engaged in "verbal combat" for more than one minute, Mr. Tweedle did not realize there was a problem until he "looked up" and saw physical fighting, with both male assailants having arrived at the scene and a crowd already gathering. *Id.* at 75:13-76:21 (Ex. 7).

If Tweedle's testimony is to be believed, then his failure to respond to the verbal altercation and attempt to de-escalate it was particularly egregious given that he had been specifically trained by the casino to approach patrons engaged in a verbal altercation and to try to de-escalate the situation. *Id*. at 23:21-24:12 (Ex. 7).

Plaintiffs note that notwithstanding Mr. Boss' opinions in the case, a jury could find that Tweedle failed to exercise reasonable care based upon his own testimony that he failed to respond to the verbal altercation and attempt to de-escalate the situation prior to it evolving into a physical assault of the Plaintiffs.

### c. The Casino's Failure to Have Three Patrol Vehicles Roving in the Garage at the Time of the Incident Was also a Violation of the Standard of Care

Another opinion of Mr. Boss was that the Defendant breached the standard of care with respect to the lack of roving patrols it had within the garage at the time of the incident, thereby contributing to the lack of deterrents on the fifth floor of the garage. The standard of care or reasonable care required the Defendant to have three patrol vehicles always roving the garage, in conjunction with the stationary patrols at the stairwells/entrances of the garage levels. *See* Boss Report (Def. MSJ Ex. 4) at 26. According to Thomas Casella, the Defendant's corporate designee, the garage security team was, in fact, supposed to have two golf carts and one vehicle

roving the garage at the time of the incident. Cassella Dep. 53:5-21; 55:10-17 (Ex. 2). Yet, according to Tweedle, there was only one golf cart in use that night. Tweedle Dep. 59:22-60:2 (Ex. 7). Additionally, Mr. Tweedle's vehicle was stationary on the ramp. Accordingly, there is evidence upon which to conclude that the Defendant did not have three roving vehicles in the garage at the time of the incident, in violation of the standard of care.

### d. Mr. Boss Applied the Correct Standard for the Liability of a Casino for Injuries to its Invitees

As stated by the defense in the Motion, the duty the Casino owes towards its invitees is to "'use reasonable and ordinary care to keep the premises safe for the invitee and to protect the invitee from injury…'" (Def. MSJ at 18). This is precisely the standard that Mr. Boss applied in rendering his liability opinions in this case. In his Rule 26(a)(2) report, Mr. Boss expressly stated the liability standard he was applying when he identified the security measures that a casino "exercising reasonable care in its security practices under similar circumstances facing the Horseshoe casino would have taken…" *See* Boss Report (Def. MSJ Ex. 4) at 21. Throughout his report, Mr. Boss used the phrases "standard of care and/or failed to exercise reasonable care" and "lack of reasonable care." *Id*.

Furthermore, Mr. Boss clarified in his deposition that he defined the "standard of care" as reasonable care under same or similar circumstances:

> Q.    Can you tell me how – what is the standard of care? How is that defined under Maryland law?

> [Objection by Plaintiff's counsel omitted]

> A.    Okay. So to be able to exercise reasonable care, you know, that a security team, program or business would do so under the same or similar circumstances is what I would say.

Boss Dep. 247:9-18 (Ex. 1). Even Alan Zajic, the Casino's own liability expert, agreed with Mr. Boss' above-mentioned definition of the standard of care. Zajic Dep. 246:25-247:18 (Ex. 12).

Defense counsel also misleads this Court in stating in the Motion that Mr. Boss applied some type of "strict liability" standard in this case based upon a statement in his deposition that one crime "is too many" for a casino property (Def. MSJ at 18). First, as defense counsel acknowledged in his question and Boss reiterated in his answer, Boss thought "zero crime" was an *aspirational goal or ideal,* and not the standard of care. Boss Dep. 168:21-170:3 (Ex. 1).

And contrary to defense counsel's assertion in the Motion – Mr. Boss did, in fact, consider crime trends in his opinions and, according to Mr. Boss, there were multiple crimes occurring on a yearly basis and not much difference in crime from year-to-year (*Id.* at. 168:21-170:3 (Ex. 1)), so defense counsel's hypothetical "one crime" or "zero crime" scenario is irrelevant and a red herring.

In fact, in his deposition, Mr. Boss repeatedly testified in clear and unequivocal terms that whether a Casino with a history of prior violent crime would be liable for an incident would depend upon the circumstances of that case. *Id.* at 163:6-10, 164:7-20 (Ex. 1). Accordingly, Mr. Boss did, in fact, apply the correct standard ("reasonable care under the circumstances") to the Casino's security practices.

### e. There is Legally Sufficient Evidence that the Casino had Actual or Constructive Knowledge of a Dangerous Condition

The dangerous condition in this case that needed to be eliminated, as stated by Mr. Boss, was the security guard's positioning outside of level five (instead of inside the garage level) of the garage with an obstructed view of the garage level, where he could not effectively monitor the garage level or serve as a deterrent to criminal activity, which had been thriving in the garage in the years prior to the incident and had been occurring primarily inside the garage levels. *See*

Boss Report (Def. MSJ Ex. 4) at 23. Mr. Tweedle admitted that he would intentionally place his security team on the outside levels of the garage – and not inside of the level. Tweedle Dep. 90: 9-14 (Ex. 7). He also admitted that he was outside of the garage level at the time of the incident. *Id.* at 79:19-21 (Ex. 7). Mr. Boss explained in his deposition that this was a dangerous practice because you cannot see the floor from that position and you cannot see people coming in and out:

> Q.    Is it your opinion that it is a violation of the standard of care for a security officer not to be able to see the entire level of a parking garage from one location?
>
> A.    I think it's a violation of the standard of care if you can't see, you know, the areas where people are going to be and where they're going to enter and exit to be posted outside on a ramp.  As a matter of fact, I don't know why he was posted there, but-
>
> Q.    Well, he testified about it in his deposition, didn't he?
>
> A.    Well, yeah, he said he parked there.  But what I'm referring to, I don't know why he would park there as a security measure.  I mean, because you can't see the floor from that particular area and you can't see where the people are going in and out.

Boss Dep. 117:1-16 (Ex. 1).

Accordingly, there is a genuine dispute of fact as to whether a dangerous condition existed at the time of the incident about which the Defendant knew or should have known.

### III.    THERE ARE GENUINE DISPUTES OF MATERIAL FACT AS TO WHETHER THE CASINO'S NEGLIGENCE WAS A PROXIMATE CAUSE OF PLAINTIFF'S INJURIES

#### a.  Mr. Boss Sufficiently Opined as to a Causal Link Between the Casino's Breach of the Standard of Care and Plaintiffs' Injuries

In the instant case, Mr. Boss has explicitly opined as to a causal link between the Casino's failure to exercise reasonable care in its security practices and the Plaintiffs' injuries:

> Q.      (By Mr. Komis) Mr. Boss, is it your opinion that, more likely than not, had a guard been posted or an officer been posted by the stairwell and elevator on parking garage level five at the time of the incident, more likely than not, the assault on the Wormacks would have been prevented:
>
> (Objection omitted)
>
> A.      It is.

Boss Dep. 398:8-15 (Ex. 1).

Moreover, Mr. Boss also addressed the causal link between the Defendant Casino's failure to comport to the standard of care and Plaintiffs' injuries in his report:

> Had Defendant put in place the appropriate standard of care for the gaming industry and applied common security and surveillance techniques such as active posts and patrols, operational policies and procedures, documentation of operations to provide records and accountability and applicable training, the assault on Plaintiff, more likely than not, would not have occurred at all…Had Defendant complied with the standard of care, the crime would have been prevented or deterred, or Defendant would have been in a position to stop it.

*See* Boss Report (Def. MSJ Ex. 4) at 33.

Defense counsel mischaracterizes Mr. Boss' testimony when he argues that Mr. Boss admitted that his causation opinions are speculative. Mr. Boss has never said that his opinion that the posting of a security guard or officer at the stairwell of level of five would have prevented the assault on the Plaintiff was speculative. The excerpts from Mr. Boss' deposition that defense counsel cites relate to other matters, such as the number of roving vehicles and the lack of security officers on the fourth floor, both of which are not relevant to the specific issue of whether the lack of a security officer on the fifth floor of the garage caused Plaintiff's injuries. As Mr. Boss stated in his deposition testimony *supra,* the presence of a properly positioned officer on the fifth floor, alone, would have prevented the Plaintiff's injuries.

Furthermore, the case of *Mitchell v. Rite Aid,* 257 Md. App. 273 (2023) is inapposite to the facts of the instant case. In *Mitchell*, the Plaintiffs' security expert "could not identify any

causal link between the perceived breaches and the Mitchells' injuries." *Id.* at 329. This is not

the case with Mr. Boss, who has expressly opined to such a causal link. And Mr. Boss never

agreed, like the expert in the *Mitchell* case, that if the Casino "had done everything correctly, in

his opinion, that he could not say that the incident would not have occurred, or that people would

not have been injured or killed." *Id.* at 330. Finally, in *Mitchell,* unlike in the instant case, there

was no evidence of hundreds of prior violent crimes having taken place at Rite Aid's facility to

have made the third-party criminal attack foreseeable.

Accordingly, there is sufficient evidence of a causal link between Defendant's negligent

conduct and Plaintiffs' injuries to preclude the granting of summary judgment.

### b. There is Sufficient Evidence to Create a Triable Issue of Fact as to Whether the Assailants' Conduct was Foreseeable.

As the Court in *Mitchell* stated, one of the ways in which the foreseeability of an incident

can be proven is by showing that "'the landowner had prior knowledge of similar criminal

activity – evidenced by past events – occurring on the premises.'" *Mitchell at* 325-326 (quoting

*Troxel v. Iguana Cantina, LLC,* 201 Md. App. 476, 491,497 (2011)). In the instant case, there is

overwhelming evidence of prior similar violent crimes having occurred within the garage, which

should have placed the Casino on notice of the threat that the assailants posed to the Plaintiffs.

Additionally, as Mr. Boss notes in his report, "Defendant should have known about the

unfolding verbal and physical altercation between the assailants and the Plaintiffs had they

abided by the standard of care or reasonable care in their security and surveillance practices, and

they would have had sufficient time to respond to the incident to have prevented it had they done

so." *See* Boss Report (Def. MSJ Ex. 4) at 33. Mr. Boss' opinion that there was sufficient time is

supported by the evidence. The assailants abandoned their vehicle in a "no park" zone that was

directly in front of the elevator and stairwell entrance and they subsequently walked by this

elevator and stairwell entrance area on their way attack the Plaintiffs. *See* Boss Report (Def. MSJ Ex. 4) at 10-11; *see also* Surveillance video (Def. MSJ Ex. 1). The elevator and stairwell entrance is the location where Mr. Boss opined the Horseshoe Casino should have had a guard posted. Had a security guard been posted right in front of this area, as Mr. Boss claims they should have been, the assailants would have seen the guard posted there, which would have served to deter the assailants from committing the crime or would have provided the guard an opportunity to intervene. *See* Boss Report (Def. MSJ Ex. 4) at 24-25. Even Defendant admitted to the importance of deterrence and that it helps prevent altercations. Cassella Dep. 122:18-21; 123:7-13 (Ex. 2).

Furthermore, a properly positioned guard at the stairwell would have heard Mr. Goodman yelling "that the faggot motherfucker right there, yeah" and "yeah, I'll fuck you up" and would have had sufficient time to intervene to either investigate this verbal assault on the Plaintiffs or to inquire as to why the assailants had parked in a "no park" zone. *See* Boss Report (Def. MSJ Ex. 4) at 25, 33. Approximately one minute and seventeen seconds elapsed between the time that the assailants parked their vehicle in a "no park" zone and ultimately attacked the Plaintiffs. *See* Boss Report (Def. MSJ Ex. 4) at 10, 15; *see also* Surveillance video (Def. MSJ Ex. 1). This would have afforded more than adequate time for a guard standing right by the parked vehicle to have approached the assailants, ask them why they were stopping in a "no parking zone," and deter them from proceeding with their attack on the Plaintiffs.

Furthermore, Mr. Tweedle would have had sufficient time to intervene and/or to serve as a deterrent and prevent the crime. Mr. Tweedle was in a vehicle outside of the garage level. He claimed that he could hear everything down to where the assailants' vehicle was parked in the no parking zone. Tweedle Dep. 134:7-11 (Ex. 7). Mr. Tweedle would have had nearly one and one-

half minutes to drive his vehicle to where the assailants were and to serve as a deterrent. As for how effective Mr. Tweedle's presence would have been at deterring the assailants, video evidence shows that the fight ended within six seconds after Mr. Tweedle appeared on the scene. *See* Boss Report (Def. MSJ Ex. 4) at 20; *see also* Surveillance video (Def. MSJ Ex. 1).

Defense counsel's reliance upon the Fourth Circuit's unreported opinion in *Bias v. IPC Int'l Corp.,* 107 F.3d 865 (4th Cir. 1997) to argue that the altercation between the assailants and Plaintiffs evolved too quickly and unexpectedly for it to have been foreseeable is misplaced. The facts in *Bias* are materially distinguishable from the facts in the instant case, in that in *Bias*, unlike in the instant case, there was not an allegation that a guard should have been stationed near where the assailants were. In *Bias,* a man was shot in a mall parking lot and the allegation was that had the mall had at least two security officers posted *inside* of the mall, the shooting would have been prevented. *Id.*

In contrast, the allegation in the instant case is that the Casino failed to place a security guard on the same garage level where the Plaintiffs were attacked, and had there been a security guard stationed near the elevator entrance/stairwell of garage level five (right in front of where the assailants had parked and abandoned their vehicle), the guard would have been in a position to deter the assailants from attacking the Plaintiffs or at least intervene before the encounter turned violent.

## IV.    DEFENSE COUNSEL'S CRITICISMS OF MR. BOSS' QUALIFICATIONS ARE MERITLESS

In the Motion, defense counsel implies that for an expert to be qualified to render opinions in this matter, he is required to have had specific experience working at a casino that was the same size as the Horseshoe Casino and in the same geographic location. Furthermore, defense counsel also implies that the expert needs to know with specificity the garage security

practices of other casinos back in 2019 to give opinions in this case. Notwithstanding defense counsel's failure to cite any case law in support of this position, the Federal Rules of Evidence impose no such requirements on expert testimony. Federal Rule of Evidence 702 addresses the circumstances under which an expert can qualify to render opinions in a case:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (**a**) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (**b**) the testimony is based on sufficient facts or data;
> (**c**) the testimony is the product of reliable principles and methods; and
> (**d**) the expert has reliably applied the principles and methods to the facts of the case.

Fed Rules Evid 702.

Mr. Boss is certainly qualified as a casino security expert in this case by virtue of his knowledge, skill, and experience in the field of casino security. He is currently the surveillance director of a casino in Washington state, having previously served as the vice president of security of two large casinos in Las Vegas (The Palms and Excalibur) and director of security at two other casinos. *See* Boss CV, Ex. 13. He is also board certified in security management. *Id.* Even the Casino Defendant's own liability expert, Alan Zajic, who has co-authored two books with Mr. Boss (Casino Security and Gaming Surveillance and Casino and Gaming Resort Investigations), Zajic Dep. 136:8-14 (Ex. 12), agrees that Mr. Boss is qualified to render opinions as an expert in casino security. *Id.* at 137:14-23 (Ex. 12). Mr. Zajic also testified that he has "referred a lot of cases to Mr. Boss;" that he has mentored Mr. Boss; and that they have served as experts on opposing sides before. *Id.* at 38:8-23 (Ex. 12).

Furthermore, defense counsel incorrectly implies that Maryland laws, statutes and regulations are relevant to establishing the standard of care for security within the garage when he writes in the Motion that Mr. Boss "did not use or account for Maryland laws, statutes or

regulations regarding casinos or security in preparing his report and opinions in this case," and that he has never reviewed "any Maryland laws, statutes or regulations regarding security." (Def. MSJ at 14-15.). First, a state-mandated regulation does equate to the standard of care. While the state may impose a universal bare minimum standard, the "standard of care" in this case addresses what a "reasonable" security team would do under similar circumstances. *See Armacost v. Davis,* 462 Md. 504, 526 (2019).

Second, there are no Maryland statutes and regulations that specifically address security measures *within a casino parking garage*, as confirmed by the Defendant's own expert in this case. *Id.* at 79:3-80:1 (Ex. 12) (emphasis added). And contrary to defense counsel's assertion, Mr. Boss did, in fact, search for relevant Maryland regulations, but like Mr. Zajic, found none that were pertinent to security within parking garages. Boss Dep. 47:17-48:3 (Ex. 1).

Furthermore, Mr. Boss had a correct understanding of how Maryland law defines a landowner's duty towards invitees such as one of "reasonable care." *Id.* at 247:9-18 (Ex. 1). Mr. Boss also stated that the standard of care does not vary based on geographic location and that the standard of care for a casino in Las Vegas would be the same standard of care for a casino in Baltimore. *Id.* at 247:19-248:2 (Ex. 1).  Accordingly, defense counsel's criticism of Mr. Boss' understanding of Maryland law is unfounded and should be disregarded.

## CONCLUSION

Given the hundreds of violent crimes that had occurred at the Horseshoe Casino, including thirty-three violent crimes within its parking garage, in the years prior to the assault of the Plaintiffs, it is abundantly clear that the Horseshoe Casino had a duty to take reasonable measures to protect its patrons, including the Plaintiffs, from third party criminal conduct. Additionally, Plaintiffs' liability expert, Derk Boss, who, per the defense expert's own

admission, is eminently qualified to opine on matters of casino security, established through his testimony that the Defendant breached the standard of care in numerous ways that led to the Plaintiffs' injuries, but mainly by having failed to place guards *within* the garage level by the elevator entrance/stairwell to serve as a deterrent to those patrons coming in and out of the casino. And given Mr. Boss' testimony that the placement of such guards at the proper location would have prevented the Plaintiffs' injuries through deterrence and/or an intervention, a reasonable jury could conclude from this evidence that there would have been sufficient time for a guard to have intervened and deterred the assailants from having committed the crimes on the Plaintiffs had the guard been properly positioned. There is also a genuine factual dispute here as to whether Mr. Tweedle was alert and paying attention to his surroundings at the time of the incident, and whether he should have responded to the incident earlier before it deteriorated into a physical altercation. Accordingly, summary judgment is inappropriate, and the Motion should be denied.

## **REQUEST FOR A HEARING**

Plaintiffs request a hearing on this Motion.

Respectfully submitted,

**KARP, WIGODSKY, NORWIND,
KUDEL & GOLD, P.A.**
  */S/ Demosthenes Komis*
Ronald A. Karp, Bar No. 01015
rkarp@karplawfirm.net
Demosthenes Komis, Bar No. 30147
dkomis@karplawfirm.net
Zachary King, Bar No. 18040
zking@karplawfirm.net
2273 Research Boulevard - Suite 200
Rockville, Maryland 20850
301-948-3800 – Phone
301-948-5449 – Fax
*Counsel for the Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on the  14th  day of November 2023, a copy of the foregoing ***Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment*** was served by ECF to all counsel of record.


  /S/ Demosthenes Komis
Demosthenes Komis