IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **WALLACE WORMACK,** *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No. 1:22-cv-01108-SAG |
| | * | |
| **CBAC GAMING, LLC,** *et al.*, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

This case involves injuries sustained by victims of a violent assault in the parking garage of the Horseshoe Casino in Baltimore, Maryland. Pending before this Court are two motions: a Motion for Summary Judgment filed by the casino's operator, Defendant Caesars Baltimore Management Company, LLC ("CBMC"), ECF 51, and CBMC's Motion *in Limine* to Exclude the Testimony of Plaintiffs' Liability Expert, ECF 52. This Court has reviewed the motions, exhibits, oppositions filed by Plaintiffs Wallace Wormack, Lakeisha Jones, and Carolyn Marshall (collectively "Plaintiffs"), and CBMC's replies. ECF 53–59. No oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, CBMC's motions will be GRANTED.[1]

I.   **FACTUAL BACKGROUND**

The facts below are taken in the light most favorable to Plaintiffs as the non-moving party. At approximately 2:30 a.m. on Sunday, March 3, 2019, Wormack, his wife, Jones, and his mother-in-law, Marshall, departed the Horseshoe Casino and entered the fifth floor of the casino's seven-

---

[1] The parties will have one week to review this Memorandum Opinion and to suggest redactions that should be made before the opinion is publicly filed.

1

floor parking garage via a stairwell. ECF 53-1 at 4; ECF 56-14 at 130:1-9, 139:19–22, 140:11–15. As Plaintiffs approached their vehicle on foot, a dark gray sedan with three occupants drove past them and the female occupant, later identified as Sequoia Brooks, asked Wormack for a lighter. *Id.* at 143:4–13, 144:14–15, 145:9–12. Wormack responded that he did not have one because he did not smoke. *Id.* at 143:4–13. Brooks then yelled obscenities at Wormack. *Id.* at 146:1–7. The sedan continued down the aisle and parked in a "no parking" travel lane by the elevator at approximately 2:31:38 a.m. *See* ECF 51-2 (Surveillance Video). Kilil Goodman and Brooks exited the sedan and began to follow the Plaintiffs on foot at approximately 2:31:47 a.m. ECF 53-1 at 11. Goodman was not wearing shoes. *See* Surveillance Video. Goodman and Brooks were yelling obscenities at Plaintiffs, and Goodman was clapping his hands. ECF 56-14 at 155:3–10. Wormack told Goodman, "Bro, I don't want any trouble, man. Just go on about your business." *Id.* at 157:11–12. At approximately 2:32:55 a.m., Goodman pushed Jones. ECF 53-1 at 11; ECF 56-14 at 157:4–15. Wormack attempted to de-escalate the situation, but Goodman struck all three Plaintiffs with his closed fists to their faces and bodies. *Id.* at 157:22–158:12, ECF 56-15 at 70:16–71:2. All three Plaintiffs did not feel physically threatened or believe there would be a physical altercation until seconds before it occurred. ECF 51-6 at 386:10–17. At 2:33:16 a.m., the third occupant of the sedan, Jordan Waters, ran over and also punched Wormack with his fists closed. ECF 56-15 at 71:3–14. Waters then body-slammed Wormack onto his back, causing him to hit his head on the concrete garage floor and lose consciousness. *Id.* at 71:15–21.

During the altercation, the closest member of the casino's garage security team was Sheldon Tweedle, the security team manager. ECF 56-11 at 84:3–12. Tweedle's security vehicle was parked on a ramp between the fifth and sixth levels of the parking garage. *Id.* at 70:18–71:5. Tweedle's location did not permit him a view of the parked sedan or the verbal altercation between

the Plaintiffs, Goodman, and Brooks, but it did permit him to see the fight itself. *Id.* at 74:13–75:1; 75:10–12. When Tweedle heard cursing and yelling, he looked up to see the physical altercation. *Id.* at 76:17-21. Although he could not drive right to the location due to the crowd that had formed around the altercation, his security lights were activated by 2:33:21 a.m. (he arrived at the scene by 2:33:40, roughly thirty-five seconds after Waters exited the sedan). *See* Surveillance Video. Backup security arrived promptly. *Id.* The fight ended in its entirety by 2:33:46 a.m., just over two minutes after the sedan stopped. *Id.*

In the five years preceding this incident, the Baltimore Police Department ("BPD") and the security reports from the casino reported 262 calls for service to the casino for "crimes against a person."[2] Thirty-three of those were violent crimes that occurred in or ended in the parking garage, and twenty-two of those violent crimes took place on weekends. ECF 53-1 at 22. Other violent crimes occurred in the casino itself.

On the night of the incident, Tweedle posted himself on the external ramp between floors five and six to have a view looking down over levels four and five. ECF 56-11 at 71:4–21. There were some portions of level five he could not see from that vantage point. *Id.* at 73:4–12. Although there is a BPD substation in the casino garage, police do not regularly patrol the garage unless they are called for service. ECF 56-12 at 17:19–18:6; 29:13–30:10.

## II. MOTION TO EXCLUDE EXPERT TESTIMONY

### A. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. A qualified expert may give testimony if:

---

[2] This figure was compiled by Plaintiffs' expert, Derk Boss, who conceded at deposition that he was uncertain how he had reached that figure. ECF 51-6 at 138–54, 172–73, 288–89.

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702. In essence, the trial court must ensure the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). In *Daubert*, the Supreme Court provides five non-exhaustive factors a court may weigh in making this assessment: (1) "whether a theory or technique . . . can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the technique or theory has gained "general acceptance." *Id.* at 593–94; *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 452 (4th Cir. 2010). However, ultimately, the inquiry is "a flexible one" and relevant factors can vary with the needs of each case. *Daubert*, 509 U.S. at 594.

For the proffered evidence to be sufficiently reliable it "must be derived using scientific or other valid methods" and not based on mere "belief or speculation." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). The court's analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are speculative and are not supported by the record," is inadmissible. *Tyger Const. Co. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion

proffered."). For the proffered opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Casey*, 823 F. Supp. 2d at 341 (quoting *Daubert*, 509 U.S. at 591). Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Anderson v. Home Depot U.S.A., Inc.*, Civ. No. GJH-14-2615, 2017 WL 2189508, at *4 (D. Md. May 16, 2017) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The proponent of the expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*." *Id.* at *3 (quoting *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, Civ. No. JFM-08-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see also Casey*, 823 F. Supp. 2d at 340–41; *Daubert*, 509 U.S. at 592 n.10 (explaining admissibility must be established by a "preponderance of proof").

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On the one hand, Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* (explaining that admissible expert testimony can still be vigorously tested before the jury by "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (quoting *Daubert*, 509 U.S. at 596)). On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). The court must determine whether the disputed expert testimony "has a greater potential to mislead than to enlighten." *Id.* If so, the

testimony should be excluded. *Id.*; *see also Casey*, 823 F. Supp. 2d at 341 (noting such testimony would be barred by Federal Rule of Evidence 403).

B. Discussion

CBMC does not contest that Plaintiffs' expert, Derk Boss, possesses the requisite knowledge, skill, and experience to serve as an expert witness in the area of casino security. *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) ("[O]nly experts qualified by 'knowledge, skill, experience, training, or education' may submit an opinion." (quoting FED. R. EVID. 702)). Boss has extensive experience in the casino industry. But although Boss has the appropriate credentials to offer expert opinion and testimony, he still must use a reliable methodology to reach his conclusions. *See* FED. R. EVID. 702(c)–(d). Here, he has not done so.

Boss opines that CBMC "did not have a reasonable and prudent security program that identified and addressed all of the threats and vulnerabilities that existed within the parking garage" and "failed to adapt to the types and frequency of criminal activity occurring within the garage or follow the guidelines they did have in place." ECF 53-1 at 33. In terms of specific failures, Boss opines that failing to have a security officer stationed "inside of level 5 of the garage at the time of the incident" was a deficiency that violated the standard of care. *Id.* at 22. In fact, he opines that "[t]here should have been a security officer posted at the elevator entrance/exit for levels four, five, and six. This is the area where patrons gather, pass each other, and enter and exit the casino, and the risk is highest for unruly activity." *Id.* at 24.

The problem is that Boss provides no basis, other than his own belief, for reaching those conclusions. Boss cites no guidelines or sources outlining best practices or standards of care requiring stationary security officers to be posted on every level of a casino parking garage or at

6

every point where patrons might gather or enter a garage. ECF 51-6 at 25:9–20. He does not have experience working in casino garages that have adopted such practices. *Id.* at 74:6–75:4. In fact, Boss specifically testified that the number of dedicated security officers in the Horseshoe's garage is higher than he has experienced in the casinos where he has worked. *Id.* at 265:22–266:7. In the casino in Arlington, Washington where Boss is presently employed as the Director of Surveillance, there is a single security guard that patrols the multi-story garage and associated flat parking lots in a roving vehicle. *Id.* at 26–27. Although it is fair to assume that the Horseshoe Casino is in a higher crime area and experiences more security problems, Boss offers no basis for his conclusory opinion that the Horseshoe owes a duty to have dedicated officers in each specific location in the garage where Boss deems "the risk is highest for unruly activity." ECF 53-1 at 24.

Finally, the facts of this case do not support Boss's conclusion that the risk is highest near a parking garage elevator or that stationary protection by the elevator on level five would prevent or deter foreseeable crime. The elevator itself had no connection to what transpired, because Plaintiffs were already walking from the stairwell towards their car and the assailants had driven into the garage via the ground floor. None of them used the elevator. It just so happened that the assailants stopped their sedan near the elevator entrance on level five, but they could have stopped anywhere in the garage and committed an equivalently unpredictable assault. More significantly, Boss provides no analysis of previous incidents occurring in the Horseshoe's garage to show that they generally occurred near the elevator or on levels four, five, or six where the public is permitted to park.[3] His opinion that stationing a security officer in those particular locations would deter

---

[3] In fact, ECF 56-3 purports to summarize the incidents of violent crime in the Horseshoe's parking garage between 2014-2018 (although it appears to include several that occurred elsewhere on casino grounds). Of the twenty-eight incidents listing a "parking garage" location, just two occurred somewhere on level five (though not necessarily near the elevator because the location is unspecified). Thirteen were on level three, and seven were on level four. Level three is not one of

7

violent crime has no evident factual premise and appears to be derived solely in hindsight, taking into account where the incident in this case happened to occur. There are no facts suggesting that violent crime in this location would have been foreseeable to CBMC.

Boss also suggests that security personnel should be in a stationary location where they have a full unimpeded view of an entire garage floor from inside the garage itself and are able to hear clearly. Again, he cites no industry standards or other peer-reviewed sources to support those opinions, which are contrary to general casino garage security practices as Boss has described them. Boss's suggestion is also inconsistent with any layperson's observation of parking garages, which almost invariably are built with pillars and structures impeding certain sight lines but providing necessary support to the garage itself.

Boss's report raises some other issues such as the experience of the casino's security personnel, the adequacy of its security operations and procedure manual, and the lack of a dedicated agent monitoring the surveillance cameras in real time. ECF 53-1 at 29–32. Such issues have no relevance in this case, as Boss adduces no evidence that any of those factors caused Plaintiffs' injury or could have expedited the security team's less-than-one-minute response to this incident.

Moreover, Boss does not provide support for his opinion that Goodman, an intoxicated individual who got out of his car with no shoes on and approached Plaintiffs in the garage, would

---

the floors Boss recommends for increased security. *See* ECF 53-1 at 24. Finally, the casino established its garage security team in late 2017 or early 2018, ECF 56-11 at 33:12–34:7, making any historical incidents before that time less relevant to assessing the efficacy of the garage's security at the time Plaintiffs were attacked. The only other incident reported on ECF 56-3 taking place on level five after the security team was established is a rape alleged to have occurred inside a vehicle that the victim seemingly entered voluntarily with the accused rapists on April 7, 2018. ECF 56-3 at 1, 69–70. In other words, Boss cites no evidence that anything similar to this incident had occurred near the level five elevator once CBMC created its garage security team.

have been effectively deterred by seeing security officers in a particular location. In fact, Boss conceded at several points during his deposition that his proposed security measures may or may not have prevented or halted Goodman's attack. ECF 51-6 at 308:15–23, 313:7–16, 328:5–29:3, 369:3–16; s*ee also JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 322 (D. Md. 2017) ("Expert testimony rooted in subjective belief or unsupported speculation does not suffice." (quoting *Zuckerman v. Wal-Mart Stores E., L.P.*, 611 F. App'x 138, 138 (4th Cir. 2015))).

Ultimately, while Boss has significant experience with casino security, his opinions in this case are not tied to any scientific method, industry standard, or factual premise. Such *ipse dixit* reasoning cannot be the basis for an admissible expert opinion. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))).

For the reasons stated, then, this Court concludes that Boss's opinion that CBMC violated the standard of care by failing to have a reasonable and prudent security program is not the byproduct of a reliable, or reliably applied, methodology. Accordingly, his testimony will be excluded.

## III.   MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). CBMC, as the moving party, bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing

*Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If CBMC establishes that there is no evidence to support Plaintiffs' case, the burden then shifts to Plaintiffs to proffer specific facts to show a genuine issue exists for trial. *Id*. Plaintiffs must provide enough admissible evidence to "carry the burden of proof . . . at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of Plaintiffs' position will be insufficient; there must be evidence on which the jury could reasonably find for Plaintiffs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Casey*, 823 F. Supp. 2d at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)). Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. Plaintiffs "must produce competent evidence on each element of [their] claim[s]." *Miskin*, 107 F. Supp. 2d at 671. If Plaintiffs fail to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *see also Casey*, 823 F. Supp. 2d at 352. In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

Since the alleged tort and resulting injury occurred in Maryland, the Court applies Maryland law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941); *Branhaven, LLC v. BeefTek, Inc.*, 965 F. Supp. 2d 650, 664 (D. Md. 2013) ("When a claim is based on state law, the choice of law rules are those of the state in which the district court sits."); *Lab. Corp. of*

*Am. v. Hood*, 911 A.2d 841, 845 (Md. 2006) (holding that, in a tort action, Maryland applies the law of the state where the injury occurred).

### B. Discussion

Under well-established Maryland negligence jurisprudence, a properly pleaded claim of negligence includes four elements. Plaintiffs must show (1) that CBMC owed a duty to protect Plaintiff from injury, (2) that CBMC breached that duty, (3) that CBMC's breach of the duty proximately caused the loss or injury suffered by Plaintiffs, and (4) that Plaintiffs suffered actual loss or injury.[4] *Troxel v. Iguana Cantina, LLC*, 29 A.3d 1038, 1049 (Md. Ct. Spec. App. 2011). In premises liability cases, the duty of care owed by a landowner is determined by the legal classification of the entrant. *Deboy v. City of Crisfield*, 893 A.2d 1189, 1193 (Md. Ct. Spec. App. 2006). That is, the duty of care varies according to whether the visitor is an invitee, licensee, or trespasser. *Id*. In the instant case, both parties agree that Plaintiffs' legal classification is that of a "business invitee."

The business invitee is owed the highest duty of care. *See id.* A landowner must "exercise reasonable care to protect the invitee from injury caused by an unreasonable risk that the invitee would be unlikely to perceive in the exercise of ordinary care for his or her own safety, and about which the owner knows or could have discovered in the exercise of reasonable care." *Rybas v. Riverview Hotel Corp.*, 21 F. Supp. 3d 548, 561 (D. Md. 2014) (internal quotation marks omitted) (quoting *Casper v. Charles F. Smith & Son, Inc.*, 560 A.2d 1130, 1133 (Md. 1989)). More specifically, the duties of a landowner to business invitees include "the obligation to warn invitees of known hidden dangers, a duty to inspect, and a duty to take reasonable precautions against foreseeable dangers." *Id*. A business invitee can reasonably assume that a landowner will exercise

---

[4] On April 3, 2023, this Court granted the parties' Joint Motion to Amend the Scheduling Order, ECF 45, and bifurcated the issues of liability and damages, ECF 46.

reasonable care to "ascertain the condition of the premises, and if [the landowner] discovers any unsafe condition [he or she] will either take such action as will correct the condition and make it reasonably safe or give a warning of the unsafe condition." *Rawls v. Hochschild, Kohn & Co.*, 113 A.2d 405, 407 (Md. 1955).

Despite the heightened duty owed to the business invitee, a landowner is not required to be an insurer of the invitee's safety. *Id.* at 408. Nor does a presumption of negligence arise solely because an invitee was injured on a landowner's premises. *Id.* Liability arises only where a business owner, "as a reasonably prudent person . . . should have anticipated the possible occurrence and the probable results of such acts." *Eyerly v. Baker*, 178 A. 691, 694 (Md. 1935).

Because there is no duty to insure the safety of business invitees, the circumstances in which a defendant can be sued for a criminal act committed by a third party are narrow. The law is clear that "there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists between the actor and the third person or between the actor and the person injured." *Rhaney v. Univ. of Md. E. Shore*, 880 A.2d 357, 362 (Md. 2005) (quoting *Ashburn v. Anne Arundel Cnty.*, 510 A.2d 1078, 1083 (Md. 1986)). Here, the casino had no special relationship with any party, neither Plaintiffs nor their assailants. Under Maryland precedent, the exclusive conditions that make a business liable for criminal acts of others are "physical ones that contributed to or facilitated the commission of tortious acts—not the tortious acts themselves or the tortfeasors. Such a conclusion is consistent with the general rule that there is no duty to control the tortious acts of a third person." *Id*. at 365–66.

With Boss's testimony excluded, Plaintiffs have not proffered competent evidence that any physical conditions should have led to particular security attention on the fifth floor near the elevator. Plaintiffs use general crime statistics, not linked to any particular area of the garage and

sometimes as broad as a three-mile radius around the facility itself, to suggest that additional security was warranted. But that is not the proper standard. *See Scott v. Watson*, 359 A.2d 548, 554 (Md. 1976) (noting that the duty to provide security "arises primarily from criminal activities existing on the landlord's premises, and not from knowledge of general criminal activities in the neighborhood"). In other words, a business owner does not undertake the role as a general insurer of its customers' safety simply because it locates its business in a higher crime area.

Plaintiffs also suggest that Tweedle failed to respond in a timely fashion to the "verbal altercation." The record shows that Goodman and Brooks exited their vehicle at 2:31:38 a.m., clapping and yelling. *See* Surveillance Video. However, Maryland law is clear that verbal altercations do not render foreseeable a physical violent act. *Mitchell v. Rite Aid of Md., Inc.*, 290 A.3d 1125, 1156–57 (Md. Ct. App. 2023) ("[T]he fact that there was an argument among patrons at the hotel did not indicate that appellees' agents had any information that violence might be imminent" because verbal exchanges do not "presage physical violence." (internal quotation marks omitted) (quoting *Corinaldi v. Columbia Courtyard, Inc.*, 873 A.2d 483, 494–95 (Md. Ct. Spec. App. 2005))). The physical confrontation with Plaintiffs first starts about one minute later, at 2:32:31 a.m., and the security lights appear on the video less than a minute after that, at 2:33:21 a.m. The entire interaction between Plaintiffs and the assailants in this case lasted no more than two minutes and thirty seconds, from the initial request for a cigarette lighter to the conclusion of the physical attack. *See, e.g*, *Jackson v. A.M.F. Bowling Ctrs., Inc.*, 128 F. Supp. 2d 307, 314 (D. Md. 2001) (granting summary judgment for the defendant in case of a spontaneous fight where "[t]he security staff responded quickly and broke up the fight").

Finally, as an independently dispositive reason to grant summary judgment, Plaintiffs cannot establish a genuine issue of material fact regarding CBMC's proximate causation of their

13

injuries. To prove causation in a case involving third-party criminal conduct, Maryland law mandates that a plaintiff show the defendant's breach of duty "enhanced the likelihood of the particular criminal activity which occurred." *Scott*, 359 A.2d at 556. As examples, *Scott* cited cases involving failures to repair or install locks in common areas of residential buildings, increasing the likelihood that a trespasser intending to commit a crime would enter. *Id.* (citing *Johnston v. Harris*, 198 N.W.2d 409 (Mich. 1972) (lack of adequate lighting and locks); *Braitman v. Overlook Terrace Corp.*, 346 A.2d 76 (N.J. 1975) (failure to repair broken lock on tenant's apartment); *Sherman v. Concourse Realty Corp.*, 365 N.Y.S. 2d 239 (N.Y. App. Div. 1975) (absence of lock on front door). This case presents no such physical circumstances. Nothing about the casino garage or its fifth floor, other than its mere existence in Baltimore City, enhanced the likelihood that it would be the site of a crime. Goodman and Waters did not attack Plaintiffs because of the constitution of the garage's security team or because Tweedle's security vehicle parked on the exterior ramp between levels five and six instead of in the garage itself. Because the serious assaultive conduct in this case was spontaneous, unpredictable, and unattributable to the physical condition of the Horseshoe's garage, CBMC is entitled to summary judgment.

IV. **CONCLUSION**

For the reasons set forth above, CBMC's Motion *in Limine* to Exclude the Testimony of Plaintiffs' Liability Expert, ECF 52, is GRANTED and its Motion for Summary Judgment, ECF 51, is also GRANTED. A separate order is filed herewith.

Dated: December 15th, 2023

/s/  
Stephanie A. Gallagher  
United States District Judge